PD-0144-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 3/11/2015 3:07:58 PM
Accepted 3/12/2015 9:48:10 AM
ABEL ACOSTA
CLERK

# NO. PD-0144-15

## In The

# Texas Court of Criminal Appeals

*Michael Tucker*, Petitioner

*v.*

*The State of Texas*, Respondent

*81st Judicial District Court*
*Hon. Stella Saxon presiding*

## PETITION FOR DISCRETIONARY REVIEW

Ross S. Elliott
Rogers & Moore, PLLC
309 Water St., Suite 114
Boerne, Texas 78006
(830) 816-5487
Fax: (866) 786-4777
*ross@rogersmoorelaw.com*
Attorney for Petitioner

**Oral Argument Requested**

FILED IN
COURT OF CRIMINAL APPEALS

March 12, 2015

ABEL ACOSTA, CLERK

March 11, 2015

# IDENTITY OF PARTIES AND COUNSEL

**Petitioner:**   **Michael Tucker**
Defendant in the trial court

---

*Represented at*
*trial by:*    Anthony R. Zamora
Law Offices of Anthony R. Zamora
211 Babcock Rd. Suite A
San Antonio, Texas 78201
SBN: 00785308

Scott Simpson
Huffman & Simpson
110 W. Nueva
San Antonio, Texas 78204
SBN: 00795840

*Motion for*
*New Trial:*    Angela Moore
310 S. St. Mary's St. Suite 1830
San Antonio, Texas 78205
SBN: 14320110

*Motion for New*
*Trial and*
*On Appeal:*    Ross S. Elliott
Rogers & Moore PLLC
309 Water Street, Suite 114
Boerne, Texas 78006
SBN: 24080685
(830) 816-5487
Fax: (866) 786-5487
*www.rogersmoorelaw.com*

**Respondent:** **The State of Texas**
Plaintiff in the trial court

*Represented at*
*trial by:* Leslie Carranza
Assistant District Attorney
81st/218th Judicial District
1327 3rd Street
Floresville, Texas 78114
SBN: 24001843

Audrey Louis
Assistant District Attorney
81st/218th Judicial District
1327 3rd Street
Floresville, Texas 78114
SBN: 24025502

*Motion for New*
*Trial and*
*On Appeal:* Marc Ledet
Assistant District Attorney
81st/218th Judicial District
1327 3rd Street
Floresville, Texas 78114
SBN: 24002459

**District judge:** Hon. Stella Saxon
218th District Court
Karnes County Courthouse
210 W Calvert Ave Suite 150
Karnes City, TX 78118
(830) 780-3089

**Court of Appeals:** Hon. Karen Angelini
Hon. Sandee Bryan Marion
Hon. Patricia O. Alvarez
Fourth Court of Appeals
300 Dolorosa, Suite 3200
San Antonio, Texas 78205

# TABLE OF CONTENTS

Index of Authorities................................................................5

Statement Regarding Oral Argument................................................8

Statement of the Case............................................................9

Procedural History..............................................................10

Grounds for Review..............................................................11

Statement of Facts..............................................................12

Argument.......................................................................14

**I.** The court of appeals erred by not finding that jury misconduct harmed Mr. Tucker when direct evidence demonstrated the misconduct increased his sentence.....................................................................14

**II.** The majority of the Court of Appeals erred by finding that an omitted reasonable doubt instruction did not harm Mr. Tucker; Justice Alvarez correctly determined that the missing instruction, in light of the state's closing argument, was egregiously harmful.....................................17

**III.** The trial court abused its discretion by concluding that petitioner's argument alone opened the door to extraneous offense testimony during the guilt phase...................................................................22

**IV.** The trial court abused its discretion by finding that the probative value of DT's testimony outweighed its prejudice to Mr. Tucker.........................26

**V.** The court of appeals failed to consider arguments contained in petitioner's briefing regarding extraneous offense evidence.......................28

Prayer.........................................................................33

Certificate of Compliance........................................................34

Certificate of Service...........................................................34

# INDEX OF AUTHORITIES

## Cases

*Almanza v. State,*
686 S.W.2d 157 (Tex. Crim. App. 1984)..........................................15, 16, 17, 18

*Bass v. State,*
270 S.W.3d 557 (Tex. Crim. App. 2008)................................................22, 23

*Cosio v. State*
353 S.W.3d 766 (Tex. Crim. App. 2011)...............................................20

*Crank v. State,*
761 S.W.2d 328 (Tex. Crim. App. 1988)...............................................31

*Daggett v. State,*
187 S.W.3d 444 (Tex. Crim. App. 2005)..........................................29, 30, 31

*Ellison v. State,*
86 S.W.3d 226 (Tex. Crim. App. 2002)..............................17, 18, 19, 20, 22

*Ex Parte Varelas,*
45 S.W.3d 627 (Tex. Crim. App. 2001).................................................19

*Flores v. State,*
No. 14-12-00623-CR, 2013 Tex. App. LEXIS 12248 (Tex. App.—Houston
[14th Dist.] October 1, 2013).................................................................26

*Jennings v. State,*
107 S.W.3d 85 (Tex. App.—San Antonio 2003, no pet.)........................15, 16

*Klueppel v. State,*
505 S.W.2d 572 (Tex. Crim. App. 1974)................................................22

*Lomas v. State,*
707 S.W.2d 566 (Tex. Crim. App. 1986)................................................22

*McGowan v. State,*
729 S.W.2d 316 (Tex. App.—Dallas 1987, no pet.)................................19

*Michelson v. United States,*
335 U.S. 469 (1948)................................................................31

*Montgomery v. State,*
810 S.W.2d 372 (Tex. Crim. App. 1990)........................24, 26, 29

*Munroe v. State,*
637 S.W.2d 475 (Tex. Crim. App. 1982)...............................16

*Mozon v. State,*
991 S.W.2d 841 (Tex. Crim. App. 1999)...............................26

*Owens v. State,*
827 S.W.2d 911 (Tex. Crim. App. 1992).............................27, 28

*Patton v. State,*
717 S.W.2d 772 (Tex.App.— Fort Worth 1986)......................16

*Pittman v. State,*
321 S.W.3d 565 (Tex. App.—Houston [14th Dist.] 2010, no pet.).........29, 30

*Powell v. State,*
63 S.W.3d 435 (Tex. Crim. App. 2001)..............................passim

*Reyes v. State,*
69 S.W.3d 725 (Tex. App.—Corpus Christi 2002, pet. ref'd)......................29

*Rogers v. State,*
853 S.W. 2d 29 (Tex. Crim. App. 1993).................................19

*Smith v. State,*
530 S.W.2d 827 (Tex. Crim. App. 1976)................................15

*State of Tennessee v. Rudd,*
No. W2005-02814-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 725 (Tenn. Crim. App., at Jackson, September 13, 2007)................................25

*State of Tennessee v. Traylor,*
No. 01-C-01-9104-CC-00124, 1992 Tenn. Crim. App. LEXIS 79 (Tenn. Crim. App., at Nashville, January 31, 1992)................................25

*Tucker v. State,*
04-12-00602-CR, __ S.W.3d __, (Tex. App.—San Antonio, Oct. 8, 2014)
.................................................................................*passim*

*United States v. McGuire,*
808 F.2d 694 (8th Cir. 1987)..............................................................25

*Walker v. State,*
701 S.W.2d 316 (Tex. App.—Austin 1985, no pet.)............................14, 20, 21

*Young v. State,*
261 S.W.2d 836 (Tex. Crim. App. 1953)...........................................27, 28, 31

## **Statutes and Rules**

Tex. Code Crim. Proc. art. 37.07.....................................................17, 18, 20

TEX. R. APP. P. 66.3..........................................................................17

TEX. R. EVID. 403..........................................................................26, 28

TEX. R. EVID. 404.........................................................................*passim*

TEX. R. EVID. 606............................................................................8

## Statement Regarding Oral Argument

This case presents several issues which merit oral argument. There is documented juror misconduct; the facts of this case argue for a change in the law regarding "opening the door" for Rule 404(b) evidence; and the court of appeals was divided over charge error harm analysis.

The jurors in this case disobeyed a guilt phase instruction limiting the use of extraneous offense evidence to rebuttal by increasing Petitioner's punishment. The court of appeals did not reverse, despite direct and uncontradicted evidence of harm. In making its determination, the court of appeals incorrectly analyzed the harm caused by the jury's misconduct as if it were charge error. Since Texas Rule of Evidence 606 was enacted (the application of which was waived in this case), this Court has rarely been asked to determine what weight direct testimony from a juror should be given in determining harm.

This Court has indicated that the door to Rule 404(b) rebuttal evidence may be opened by the argument of counsel; this case demonstrates why argument alone should not open the door to evidence. The state was permitted to use Rule 404(b) evidence to preemptively rebut defensive theories mentioned in petitioner's opening statement. Ultimately, petitioner failed to offer any evidence in support of the

defensive theories. Consequently the state was afforded unnecessary rebuttal evidence and took advantage of the situation by attacking petitioner's unsupported arguments in its closing argument. Oral argument would assist this Court in determining whether it should reconsider its position.

Finally, the court of appeals determined that the trial court erred by failing to include an extraneous offense instruction in the punishment phase charge, but a majority of the court erroneously determined the harm was not egregious. In her dissent, Justice Alvarez correctly determined that reversal was warranted. This Court would benefit from oral argument to determine that Justice Alvarez's analysis is accurate and results in a just outcome.

## Statement of the Case

Petitioner Michael Jason Tucker was indicted on March 29, 2012 with three counts of indecency with a child and six counts of aggravated sexual assault. CR 1. The alleged victims were Ka and Ky (Mr. Tucker's stepdaughters).[1] CR 1. He was tried by a jury for the guilt and punishment phase in the 218th District Court, the Honorable Stella Saxon presiding.

---

[1] The court of appeals redacted the names of the minor complainants and witness. Mr. Tucker directs this Court to the reference list filed pursuant to the court of appeals' local rules to explain the redaction.

Before the jury retired, the indictment was amended to allege the following counts: Count I - aggravated sexual assault alleging the digital penetration of Ka; Count II - aggravated sexual assault alleging the penetration of Ka's sexual organ with Mr. Tucker's sexual organ; Count III - aggravated sexual assault alleging oral contact with Ka's sexual organ; Count IV - indecency with a child alleging that Ka's breast was touched; Count V - indecency with a child alleging that Ky's genitals were touched; Count VI - aggravated sexual assault alleging that Ky's mouth was penetrated by Mr. Tucker's sexual organ; and Count VII - indecency with a child alleging that Ky touched Mr. Tucker's genitals. CR 35-43. Following a jury trial and sentencing, Mr. Tucker was convicted on Count II (75 year sentence with no fine), Count III (75 year sentence with no fine), Count V (20 year sentence with no fine), and Count VII (20 year sentence with no fine). CR 61-71. Judgment was entered on August 17, 2012. CR 61-71.

## Procedural History

Mr. Tucker filed a motion for new trial on August 27, 2012, his amended motion for new trial on August 29, 2012, and, after the appearance of Rogers & Moore PLLC as Mr. Tucker's counsel, his second amended motion for new trial on September 13, 2012. CR 85, 92, 94,

95-107. Mr. Tucker's second amended motion for new trial was heard by the trial court on October 31, 2012 and was denied.

Mr. Tucker filed his notice of appeal on September 19, 2012, and his designation of record on appeal on November 15, 2012. CR 107, 112.

The Fourth Court of Appeals issued its opinion on October 8, 2014; Justice Alvarez's dissenting opinion was filed the same day.

Mr. Tucker filed his motion for rehearing on November 7, 2014, which was denied on November 19, 2014. Mr. Tucker filed his motion for rehearing en banc on December 4, 2014, which was denied on January 8, 2015.

## Grounds for Review

**The Jury engaged in misconduct while determining punishment.**
**I.** The court of appeals erred by not finding that jury misconduct harmed Mr. Tucker when direct evidence demonstrated the misconduct increased his sentence.

**The court of appeals was divided over the charge error's harm.**
**II.** The majority of the court of appeals erred by finding that an omitted reasonable doubt instruction did not harm Mr. Tucker; Justice Alvarez correctly determined that the missing instruction, in light of the state's closing argument, was egregiously harmful.

**Extraneous offense evidence was erroneously admitted.**
**III.** The trial court abused its discretion by concluding that petitioner's argument alone opened the door to extraneous offense testimony during the guilt phase.

**IV.** The trial court abused its discretion by finding that the probative value of DT's testimony outweighed its prejudice to Mr. Tucker.

**V.** The court of appeals failed to consider arguments contained in petitioner's briefing regarding extraneous offense evidence.

## Statement of Facts

In the course of Mr. Tucker's trial, the jury was presented with two extraneous offenses. The guilt phase charge contained an instruction which limited the use of the extraneous offense evidence to rebuttal. CR 35-48. However, the punishment phase charge did not include an instruction that the jury could only consider the extraneous offenses if they believed them beyond a reasonable doubt. No instruction permitted the jury to use extraneous offense evidence for a purpose other than rebuttal.

During the state's guilt phase case in chief, it was given leave to present DT's (Mr. Tucker's biological daughter) extraneous offense testimony that Mr. Tucker molested her (subject to a limiting instruction). 4 RR 55-61. The testimony's limited purpose was to rebut Mr. Tucker's defensive theory that his accusers were motivated by money. 4 RR 55-61. DT had made false accusations of molestation before, against her step uncle. 4 RR 79-82. The ensuing CPS investigation revealed no abuse occurred. 4 RR 79-82. She testified her false accusation was based on Mr. Tucker's actions. 4 RR 80-89. DT alleged Mr. Tucker digitally penetrated

her anus, touched her genitals through her clothing, asked her to touch his genitals, and asked her to place her mouth on his genitals. 4 RR 80-89.

Additionally, during the punishment phase, Sharla (Mr. Tucker's wife) accused Mr. Tucker of possessing child pornography, though no physical evidence substantiated her claim. 6 RR 6-13. Sharla claimed that Mr. Tucker had forty videos of child pornography on his personal laptop, which she accessed when he left the unsecured laptop at home. 6 RR 6-13. Sharla confronted Mr. Tucker and his parents about it, but was satisfied by their answers and did not pursue the matter further. 6 RR 9-10. Nothing beyond Sharla's testimony came before the jury, there was no physical evidence substantiating her claims. 6 RR 11; 7 B RR 1.

At the hearing on Mr. Tucker's motion for new trial, jury foreman Jose Herrera testified regarding the jury's use of DT's testimony. Herrera stated the jury used DT's testimony to increase Mr. Tucker's sentence, despite the continuing applicability of the guilt phase instruction limiting the evidence to rebuttal use only. 1 Supplemental RR 25-26. Further, Herrera testified that the jury used DT's testimony to increase Mr. Tucker's punishment because the state instructed them to. 1 Supplemental RR 26.

> Q. [Angela Moore, Mr. Tucker's attorney] Okay. Do you feel that DT's testimony that she was also victimized did it lead to additional years in his sentence?

A. [Herrera] Yes.

Q. Okay.

A. We were instructed by the assistant district attorney we could use [DT's] — that's when we could use her testimony to determine —.

Q. What the appropriate sentence was?

A. Yes, yes.[2]

1 Supplemental RR 26

Herrera unequivocally stated that the jury used DT's guilt phase testimony, which remained limited as rebuttal evidence, to enhance Mr. Tucker's punishment. 1 Supplemental RR 26. Moreover, the jury used the testimony at the state's urging. 6 RR 55, 64.

## Argument

### I. The court of appeals erred by not finding that jury misconduct harmed Mr. Tucker when direct evidence demonstrated the misconduct increased his sentence.

The court of appeals incorrectly analyzed the harm resulting from the jury misconduct in this case. Uncontradicted and unobjected-to testimony indicated the jury disregarded the trial court's limiting instruction by using DT's testimony to increase Mr. Tucker's sentence. *See Walker v. State*, 701

---

[2] Justice Alvarez would have remanded this case for a new trial on punishment as a result of this improper jury argument. *Tucker v. State*, 04-12-00602-CR, ___ S.W.3d ___, *9 (Tex. App.—San Antonio, Oct. 8, 2014) (Alvarez, J., dissenting).

S.W.2d 316, 321 (Tex. App.—Austin 1985, no pet.) (guilt phase limiting instruction applies in punishment phase absent additional instruction); *Smith v. State,* 530 S.W.2d 827, 829-30 (Tex. Crim. App. 1976) (jury engages in misconduct by ignoring the law given to it).

In denying that Mr. Tucker was harmed, the court of appeals erroneously applied an egregious harm analysis applicable to charge error to the jury misconduct issue; case law requires a wholly different standard. *Jennings v. State,* 107 S.W.3d 85, 89 (Tex. App.—San Antonio 2003, no pet.); *Tucker v. State,* 04-12-00602-CR, __ S.W.3d __, *19 (Tex. App.— San Antonio, Oct. 8, 2014). The court noted the sentence assessed was less than the maximum and the totality of the evidence was more than sufficient to justify the sentences. *Tucker* at *19. Moreover, the court expressly indicated their harm analysis was discussed "in more detail below." *Id.* The court provided the promised detail in its analysis of the harm caused by punishment charge error, analyzed using the *Almanza* egregious harm standard. *Id.* at *23-27 (*citing Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)).

The *Almanza* egregious harm analysis has no bearing on whether a trial court abused its discretion in denying a motion for new trial. Egregious harm analysis asks the court to consider the totality of the record

because the harm stemming from charge error can only be discerned by reference to what the jury measured with the charge: the totality of the evidence. When the jury is not given the correct law to apply to the facts, it stands to reason that the effect of the error can only be determined by reviewing all the facts in light of the omission, precisely the *Almanza* standard. *Almanza*, 686 S.W.2d at 171.

In contrast to charge error, reviewing jury misconduct requires the court to narrowly consider evidence of an affirmative action taken by the jury. *Jennings*, 107 S.W.3d at 89. If a defendant demonstrates 1) misconduct occurred and 2) the misconduct caused harm, the misconduct is reversible error. *Id.* Determining whether the misconduct was harmful requires reference to the jury's actions only. Speculation using the entire record is irrelevant to the issue of jury misconduct. Either the record shows the misconduct affected the judgment, or it does not. *See Munroe v. State*, 637 S.W.2d 475, 476-78 (Tex. Crim. App. 1982)).

Mr. Tucker demonstrated that he was harmed. Foreman Herrera testified the jury ignored the law given to it and increased Mr. Tucker's sentence. 1 Supplemental RR 25-26. Mr. Tucker's sentence was increased because the jury ignored the limiting instruction; his harm is evident under the correct standard of review. *See Munroe*, 637 S.W.2d at 476-78; *Patton*

*v. State*, 717 S.W.2d 772, 781 (Tex.App.— Fort Worth 1986) (*rev'd on other grounds*, 761 S.W.2d 1 (Tex. Crim. App. 1988)) ("Should it be shown that a *juror disregarded the court's instructions* and *such disregard resulted in harm to a particular defendant*, such showing would likely constitute jury misconduct calling for a new trial") (emphasis added); 1 Supplemental RR 26. This Court should review Mr. Tucker's case, correct the lower court's incorrect standard of review, and remand this case for a new trial on punishment. TEX. R. APP. P. 66.3

## II. The majority of the court of appeals erred by finding that an omitted reasonable doubt instruction did not harm Mr. Tucker; Justice Alvarez correctly determined that the missing instruction, in light of the state's closing argument, was egregiously harmful.

The majority incorrectly determined that the trial court's failure to include a Code of Criminal Procedure Article 37.07 "reasonable doubt" instruction did not cause Mr. Tucker egregious harm.[3] Tex. Code Crim. Pro. 37.07 § 3(a). Although the majority cited the correct standard, they failed to properly apply the standard they articulated. *Tucker* at *22-23 (*citing Ellison v. State*, 86 S.W.3d 226, 228 (Tex. Crim. App. 2002)).

---

[3] The majority also apparently considered Mr. Tucker's punishment charge error argument as a component of his motion for new trial. *Tucker* at *27. Mr. Tucker raised this error under *Almanza* and did not present it in his motion for new trial. Appellant's brief at 18; CR 95-104.

Justice Alvarez applied the *Ellison* standard properly in her dissent. *Tucker* at *27; *Tucker* at *9 (Alvarez, J., dissenting).

Two extraneous offenses were presented to the jury during the course of the trial: DT's allegations that Mr. Tucker raped her and Sharla's testimony that she found more than forty child pornography videos on Mr. Tucker's laptop. 4 RR 80-89; 6 RR 6-13; *Tucker* at *20. The trial court had earlier instructed the jury that DT's testimony could only be used to impeach a defensive theory if they believed it beyond a reasonable doubt during the guilt phase. 4 RR 55-62, 75; CR 44. The trial court erred by not including a 37.07 "reasonable doubt" instruction for the extraneous offenses in the punishment charge.

A missing "reasonable doubt" instruction's harm is not gauged by the evidence subject to the instruction, but rather on the effect of the instruction's absence on the jury; this standard was first articulated by *Ellison v. State,* 86 S.W.3d at 228; *Almanza v. State,* 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). Under the *Ellison* standard, the wording of the missing instruction is of particular import. The trial court failed to instruct the jury that they could not *consider* extraneous offense evidence in assessing punishment unless they believed the evidence beyond a reasonable doubt. *See* Tex. Code Crim. Pro. art. 37.07 § 3(a); CR 44 (trial

court used "consider" in guilt phase limiting instruction); *Ellison v. State,* 97 S.W.3d 698, 701-02 (Tex. App.—Texarkana 2002, no pet.) (on remand); *Ex parte Varelas,* 45 S.W.3d 627, 631-32 (Tex. Crim. App. 2001); *But see Tucker* at *7 (Alvarez, J., dissenting) (*citing McGowan v. State,* 729 S.W.2d 316, 318 (Tex. App.—Dallas 1987, no pet.)).[4]  If the record demonstrates that the jury likely considered the extraneous offense evidence during the punishment phase and their *consideration* of the evidence affected Mr. Tucker's substantial rights or denied him a fair and impartial trial, then Mr. Tucker suffered egregious harm and is entitled to a new trial on punishment.

The majority's determination that Mr. Tucker did not suffer egregious harm fixated on the overall state of the evidence in the case and concluded that it "was more than sufficient to justify the sentences." *Tucker* at *27.[5] The majority paid lip service to the *Ellison* standard, but the analysis required by this standard was conspicuously absent. *Id.* ("Had the proper instruction been included, the state's case would not have been any less

---

[4] *McGowan* is inapposite because it deals with a same-transaction contextual offense (doctrine of res gestae), an express exception to the prohibition against introducing evidence of extraneous offenses. *Rogers v. State,* 853 S.W. 2d 29, 33 (Tex. Crim. App. 1993).

[5] The majority also noted the absence of a fine in its determination that Mr. Tucker did not suffer egregious harm.  The absence of a fine was unsurprising since the state told the jury that a fine was irrelevant in its closing.  6 RR 56.

persuasive," was the extent of the majority's analysis under the *Ellison* standard). The majority did note that both parties were somewhat dismissive of Sharla's extraneous offense testimony, but did not follow up on that statement with an analysis of the trial court's error using the *Ellison* standard. *Id.* at *27.

The state's improper jury argument, which prompted Justice Alvarez's dissent, caused Mr. Tucker real harm.[6] The jury foreman unequivocally testified that the jury disregarded the guilt phase limiting instruction and used DT's testimony to increase Mr. Tucker's punishment, as the state urged them to. 1 Supplemental RR 24-26; 6 RR 55, 64. Had the trial court instructed the jury that they could only consider DT's extraneous offense testimony during their punishment deliberations if they believed DT beyond a reasonable doubt, it would have mitigated the harm caused by the state's impermissible jury argument.

Additionally, without the 37.07 instruction, DT's testimony could only be used to rebut Mr. Tucker's defensive theories. *Walker*, 701 S.W.2d at 321; 4 RR 51-61; CR 44. As a result of the state's argument the jury increased Mr. Tucker's punishment using evidence that could only be

---

[6] Justice Alvarez's quote from *Cosio v. State* is particularly apt in light of the foreman's testimony: "An egregious harm determination must be based on a finding of actual rather than theoretical harm." 353 S.W.3d 766, 777 (Tex. Crim. App. 2011).

considered for rebuttal purposes, disregarding the guilt phase jury charge. *Walker*, 701 S.W.2d at 321. Mr. Tucker's harm is not speculative; Herrara's testimony clearly indicates that the harm was real.

During the punishment phase, Sharla testified that Mr. Tucker possessed at least forty videos of child pornography, including videos where infants were raped. 6 RR 6-19. Sharla was vigorously cross-examined regarding the videos and inconsistencies in her testimony. *Id.* As noted by the majority, both parties were somewhat dismissive of her testimony during closing, despite the extreme and inflammatory nature of her allegations. *Tucker* at *27; 6 RR 60, 64-65. Despite downplaying Sharla's testimony, the state asked the jury to consider it as they determined the appropriate punishment. 6 RR 55.

Sharla almost certainly would not have convinced the jury beyond a reasonable doubt, but the jury was never instructed it needed to measure her testimony by that standard. When the state urged the jury to consider Sharla's testimony, the error's harm was magnified. 6 RR 55. The jury should not have considered her testimony, and with the appropriate instruction they would not have (the jury was also asked to consider DT's testimony during punishment, the evidence indicates they followed the

state's request). Instead, Sharla's inflammatory and highly prejudicial punishment phase testimony went unchecked.

Considering the totality of the record in light of the trial court's error, Justice Alvarez correctly determined that Mr. Tucker suffered egregious harm. *Tucker* at \*9 (Alvarez, J., dissenting). Under the *Ellison* standard, the state's improper closing exhortation for the jury to consider Sharla's testimony and punish Mr. Tucker for his crimes against DT caused him egregious harm. *Id.* at \*8 (Alvarez, J., dissenting) (*citing Klueppel v. State*, 505 S.W.2d 572, 574 (Tex. Crim. App. 1974); *accord Lomas v. State*, 707 S.W.2d 566, 568 (Tex. Crim. App. 1986)). This Court should review this case, adopt Justice Alvarez's correct application of the *Ellison* standard, and order a new trial on punishment.

## III. The trial court abused its discretion by concluding that petitioner's argument alone opened the door to extraneous offense testimony during the guilt phase.

Mr. Tucker alleged a defensive theory in his opening argument but did not introduce evidence to support it, yet he was still faced with prejudicial rebuttal evidence. The state's rationale for offering rule 404(b) evidence based on Mr. Tucker's opening argument originates in *Powell v. State*, 63 S.W.3d 435, 440-41 (Tex. Crim. App. 2001); 4 RR 6 (state cited *Bass v. State*, 270 S.W.3d 557, 563 (Tex. Crim. App. 2008) to indicate that

an opening statement alone could open the door, *Bass* cited *Powell* for this proposition). *Powell* does not support such a broad reading (as indicated by Judge Johnson's concurring opinion), and Mr. Tucker's plight demonstrates why non-evidentiary comments alone cannot support the admission of substantive (and highly prejudicial) evidence. 63 S.W.3d at 440-41 (Johnson, J., concurring). Faced with facts which bear out Justice Johnson's concurring opinion in *Powell*, this Court should clearly state that more than a mere opening argument is required to open the door to rebuttal evidence.

Mr. Tucker's opening statement promised evidence that Sharla asked for $50,000 to "make this all go away" and that Sharla had called divorce attorneys prior to the children's outcry. 3 RR 29-30. This evidence was never presented to the jury by Mr. Tucker, through either direct or cross-examination. In fact, only the state asked Sharla questions in line with Mr. Tucker's opening statement. 3 RR 134-37. Mr. Tucker elicited no evidence supporting his opening statement from other witnesses and did not present it when he took the stand.

Before it was clear that no evidence backed up Mr. Tucker's argument, the state asked for rule 404(b) evidence to rebut his opening statement that the criminal charges were made in service of "jealousy,

greed, revenge, and money." 4 RR 5. Mr. Tucker teased the jury with the prospect of a defensive narrative; however, at the time the state asked leave to present rebuttal evidence, no evidence substantiated that narrative. 3 RR 28. Beyond the rebuttal evidence, the state hammered Mr. Tucker in its closing argument for not presenting the evidence he indicated he would. 5 RR 37.

*Powell* is cited for the broad proposition that an opening statement alone can open the door to rule 404(b) evidence, but its discussion of that issue was dicta and does not justify its current reading. *Powell*, 63 S.W.3d at 439-440 (Price, J., concurring). *Powell* rested on the defendant's cross examination of the complainant to justify the introduction of rule 404(b) evidence; the opening argument merely provided context for the cross examination. *Id.* at 439.

The *Powell* majority repudiated the notion that an opening statement could never justify rule 404(b) evidence by determining that the cross-examination supported the trial court's ruling. *Id.* The Texas case cited by the majority in support of this proposition did not address opening statements at all. Instead, it was a general statement of the law regarding Texas Rule of Evidence 404(b). *Id.* at 440 n.1 (Johnson, J., concurring) (*citing Montgomery v. State*, 810 S.W.2d 372, 394-97 (Tex. Crim. App.

1990)). The majority indicated only that the lower appellate court erred in stating an opening argument could never permit rule 404(b) evidence's admission. *Id.* *Powell* merely indicated that the opening argument could be considered by a court when it determined if the evidence before the jury opened the door. It did not, as the state argued, indicate that the opening statement, standing alone, could open the door.

Judge Johnson's concurring opinion emphasizes that *evidence* is what opens the door to rebuttal evidence. *Powell,* 63 S.W.3d at 440-41 (Johnson, J., concurring). She worried that if an opening argument could open the door for rebuttal evidence, the state might be allowed to rebut evidence not before the jury. *Id.* Other jurisdictions have adopted similar reasoning because admiting rebuttal evidence based on argument alone can lead to a windfall for the state. *State of Tennessee v. Rudd,* No. W2005-02814-CCA-R3-CD, 2007 Tenn. Crim. App. LEXIS 725, *17 (Tenn. Crim. App., at Jackson, September 13, 2007) (*citing State of Tennessee v. Traylor,* No. 01-C-01-9104-CC-00124, 1992 Tenn. Crim. App. LEXIS 79, *2-3 (Tenn. Crim. App., at Nashville, January 31, 1992)); *United States v. McGuire,* 808 F.2d 694, 696 (8th Cir. 1987).

Because no evidence supporting Mr. Tucker's defensive theory was presented, the trial court abused its discretion by admitting DT's testimony

under rule 404(b). As a result, Mr. Tucker was faced with highly prejudicial testimony while being excoriated for his failure to testify as promised. This Court should clarify its holding in *Powell* — opening argument may help determine whether the door has been opened to rebuttal evidence, but it is not enough on its own to open the door. This Court should then remand this case to the court of appeals to determine whether the erroneous admission of DT's testimony harmed Mr. Tucker.

**IV. The trial court abused its discretion by finding that the probative value of DT's testimony outweighed its prejudice to Mr. Tucker.**

Mr. Tucker objected to DT's extraneous offense testimony under Texas Rule of Evidence 403; the testimony's prejudicial effect was overweening and the trial court erred by admitting it. CR 30-34. Though DT's testimony was of moderate length, it had little probative value, a great potential to affect the jury in an irrational yet indelible way, and the state did not need it. *Flores v. State,* No. 14-12-00623-CR, 2013 Tex. App. LEXIS 12248, *42 (Tex. App.—Houston [14th Dist.] October 1, 2013) (*citing Mozon v. State,* 991 S.W.2d 841, 847 (Tex. Crim. App. 1999); *Montgomery v. State,* 810 S.W.2d 372, 387-89 (Tex. Crim. App. 1991)(on reh'g)). Its probative value did not overcome its inherently prejudicial nature; her testimony should not have been admitted.

DT did not testify for a excessive length of time, her testimony was roughly the same length as Ka and Ky's. 3 RR 33-107; 4 RR 76-103. However, though DT's testimony was not overly long, it was emphasized during the state's cross-examination of Mr. Tucker and in closing argument, magnifying its presence in the jury's consideration. 4 RR 147-58; 5 RR 9-10, 14-15, 36-37, 40, 41.

The state presented DT's testimony to preemptively rebut Mr. Tucker's defensive theory that the charges were driven by Sharla's greed and desire for revenge. *See* 4 RR 5 (the state's logic for this assertion is not explicit or articulated, but their intent is clear). As rebuttal evidence, the probative value of DT's testimony is inextricably linked to how well Mr. Tucker's defensive theory was presented. However, Mr. Tucker presented no evidence to support the theory. 5 RR 36. The lack of evidence divested DT's testimony of probative value. *See Powell*, 63 S.W.3d at 440-41 n.1 (Johnson, J., concurring).

DT's testimony was very likely to influence the jury in an indelible yet ineffable manner as character conformity evidence. Extraneous offense testimony is generally inadmissible because character conformity evidence has a uniquely pernicious effect. *Young v. State*, 261 S.W.2d 836, 837 (Tex. Crim. App. 1953); *Owens v. State*, 827 S.W.2d 911, 914 (Tex. Crim. App.

1992); TEX. R. EVID. 404(b). Such evidence may entice the jury to convict the defendant for being a bad person, not for the crimes alleged in the indictment. *Young,* 261 S.W2d at 837; *Owens,* 827 S.W.2d at 914.

Further, the state's case was more than adequately made without DT's testimony. The two critical witnesses, Ka and Ky, demonstrated every element of the state's case and were only lightly impeached. The only witness impeached to any degree was Sharla, and her testimony was not essential, it merely provided context. *See* 3 RR 51-64, 91-107 (Ka and Ky were only indirectly challenged on their allegations). Additionally, Sharla's credibility was independent from Ka and Ky's. The state had no need for DT's testimony.

DT's testimony was far more prejudicial than it was probative. It answered a need the state lacked while bolstering the testimony from Ka and Ky, testimony essential to the state's case. Properly applied, rule 403 bars the use of DT's testimony. This Court should accept this petition, correct the lower court's failure to address this error, and order a new trial on Mr. Tucker's guilt.

## V. The court of appeals failed to consider arguments contained in petitioner's briefing regarding extraneous offense evidence.

Mr. Tucker argued that the trial judge abused her discretion by admitting DT's extraneous offense testimony under Texas Rule of Evidence

404(b); the court of appeals addressed only a portion of his argument. Appellant's brief at 49-57; *Tucker* at \*9-11. The court discussed (a) whether Mr. Tucker opened the door for rule 404(b) evidence, (b) if the evidence admitted under rule 404(b) was probative to rebut Mr. Tucker's defensive theory,[7] and (c) if the probative value was outweighed by the evidence's prejudicial effect. *Tucker* at \*9-11; *compare with* Appellant's brief at 39-63. The court of appeals did not address Mr. Tucker's arguments that the state failed to lay the predicate for DT's rule 404(b) evidence and DT's testimony was impermissibly used for the purposes of character conformity. Mr. Tucker properly presented these arguments and the lower court erred by disregarding them.

## a. The state did not lay a predicate for DT's rule 404(b) testimony.

Mr. Tucker argued that the state did not lay the predicate necessary to admit DT's testimony. Appellant's brief at 49-51. The state's failure may not be remedied on appeal, in hindsight. *Pittman v. State*, 321 S.W.3d 565, 573-74 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (*quoting Daggett*, 187 S.W.3d at 452-53); *Reyes v. State*, 69 S.W.3d 725, 741-42 (Tex. App.—

---

[7] Extraneous offense evidence, by its very nature, is highly probative and serves to rebut defensive theories; however rule 404(b) constrains the use of such evidence because of its highly prejudicial nature and its propensity to mislead the jury. *Daggett v. State*, 187 S.W.3d 444, 450-52 (Tex. Crim. App. 2005); *Montgomery*, 810 S.W.2d at 389-90).

Corpus Christi 2002, pet. ref'd)). The court of appeals did not address the state's failure.

In Mr. Tucker's case the state's rule 404(b) predicate never rose above generalized statements of case law and DT's testimony. The state never explained how the testimony would serve to rebut the defensive theory that allegedly opened the door for its admission. *See* 4 RR 5-7 (state briefly summarizes Mr. Tucker's opening statement and how Ka was impeached; state also cites several cases addressing how a defendant's opening statement may open the door to rule 404(b) evidence); 4 RR 57-58 (state briefly summarizes DT's expected testimony). The state never explicated how DT's testimony would rebut the defensive theories it summarized in the bench conference; the state failed to lay the predicate necessary for rule 404(b) evidence. *See Pittman*, 321 S.W.3d at 573-74 (*quoting Daggett*, 187 S.W.3d at 452-53). Because the state was unable to show with particularity how DT's testimony would serve as rebuttal evidence, the trial court abused its discretion in admitting it under rule 404(b). *Id.*; Appellant's brief at 49-51.

## b. DT's rule 404(b) testimony was used for an improper purpose.

Mr. Tucker argued that in spite of the state's reassurances that it wanted DT's testimony "for non-character-conformity reasons," the

testimony was used impermissibly. Appellant's brief at 51-57; 4 RR 7; *Daggett*, 187 S.W.3d at 452 n. 17 (*citing Michelson v. United States*, 335 U.S. 469, 475-76 (1948); *Crank v. State*, 761 S.W.2d 328, 341 (Tex. Crim. App. 1988)); TEX. R. EVID. 404. The court of appeals did not address this argument.

Prohibiting "character conformity" testimony ensures that the defendant is not convicted of a crime they were not charged with. *Young*, 261 S.W.2d at 837.[8] In closing, the state asked the jury to convict Mr. Tucker because of the similarity between the charged offense and DT's testimony, the very definition of character conformity. "And what did [Ka] tell you later on that was interesting, because DT said something similar to that?" 5 RR 10. Immediately before the jury retired to deliberate, the state again emphasized that there were three victims, before urging Mr. Tucker's conviction. "He is living and was living in a pedophile paradise. Got daughters all over the place, unlimited access. And that's what he chose to do. He took that trust that was placed in him and he violated it." 5 RR 41.

The state continued to use DT's testimony in contravention of this axiomatic principle prohibiting character conformity evidence during the punishment phase closing. *Tucker* at *8-9 (Alvarez, J., dissenting). "...[H]e

---

[8] Ironically, Mr. Tucker was originally charged for offenses against DT, allegations which were later dropped from the indictment. 4 RR 9.

has to be punished for what he's done... for all of them, for Ka, Ky, and DT" 6 RR 64 (improper argument highlighted by Alvarez, J.'s dissent). The state not only tried Mr. Tucker on an offense it dropped from the indictment, it asked that Mr. Tucker be punished for the same dropped offense.

The court of appeals ignored several arguments in Mr. Tucker's briefing. The state offered grossly inadequate support for the admission of DT's testimony and ultimately used it throughout the trial for a forbidden purpose. This Court should consider Mr. Tucker's arguments, find that the trial court abused her discretion in admitting DT's testimony, and reverse this case for a new trial on Mr. Tucker's guilt.

## **PRAYER**

Petitioner respectfully requests that this Court accept his petition, reverse the trial court's judgment, order a new trial on Petitioner's guilt, or in the alternative order a new trial on Petitioner's punishment. Petitioner also requests any other relief to which he is entitled.

Respectfully submitted,

Ross S. Elliott
State Bar No. 24080685
ROGERS & MOORE PLLC
309 Water St., Ste. 114
Boerne, TX 78006
(830) 816-5487
Fax: (866) 786-4777
*ross@rogersmoorelaw.com*

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to TEX. R. APP. P. 9.4 that the number of words used in this document, according to the word count of the computer program used to prepare the document, is 4,464.

Ross S. Elliott

## CERTIFICATE OF SERVICE

I certify that on March 11, 2015 a true and correct copy of this document was served on the following counsel of record by email and fax:

Marc Ledet
Atascosa County District Attorney's Office
1327 3rd Street
Floresville, Tx 78114
Fax: (830) 393-2205

Ross S. Elliott

# APPENDIX



# Fourth Court of Appeals
## San Antonio, Texas

### OPINION

No. 04-12-00602-CR

Michael Jason **TUCKER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Atascosa County, Texas
Trial Court No. 12-03-0067-CRA
Honorable Stella Saxon, Judge Presiding

Opinion by:   Sandee Bryan Marion, Justice
Dissenting Opinion by:  Patricia O. Alvarez, Justice

Sitting:        Karen Angelini, Justice
                Sandee Bryan Marion, Justice
                Patricia O. Alvarez, Justice

Delivered and Filed:  October 8, 2014

AFFIRMED

A jury found appellant, Michael Tucker, guilty on one count of aggravated sexual assault and two counts of indecency with a child. The jury assessed punishment at seventy-five years' confinement, seventy-five years' confinement, and twenty years' confinement respectively. On appeal, appellant challenges the sufficiency of the evidence, and he raises numerous issues alleging juror misconduct, error in the punishment phase jury charge, ineffective assistance of counsel, and improper jury argument. We affirm.

## BACKGROUND

Appellant is the step-father of two girls, Ka and Ky, and the girls lived with appellant, their mother Sharla, and little sister CT.[1] Ka (who was eleven-years-old at the time of trial) testified appellant touched her with his hand in her private area, between her legs, where she peed. She said he touched her while they were in her room, and sometimes her sisters or mother would also be in the house. She said this happened two or three times a week, and the touching started when she was seven years old. Once appellant had her touch him over his clothes on his "private part." Ka said appellant would also sometimes give her long kisses "like boyfriend/girlfriend kisses." She also remembered that once, when she was about three years old, appellant put his "private part" in her mouth. She had thought she told her mother about this incident, but later remembered she told "Caroline from ChildSafe."

Ka made the first outcry to her mother when her mother came into Ka's room and said "it's truth day . . . has anybody been touching you or anything . . . ?" Ka told her mother that appellant had been touching her. When asked what happened next, Ka said her mother's friend ("Crystal") came to get her, and she stayed at the friend's house for a while. Ka never returned to her mother's house. Ka remembered going to ChildSafe where she was examined by a nurse. Ka said she did not speak to Ky about what happened.

On cross-examination, Ka read from a written statement she gave when she was nine years old. In her statement, she said she did not know what, if anything, her mother did when she told her mother that appellant had put his "private part" in her mouth. However, on the witness stand,

---

[1] To protect the identity and privacy of the children in this case, we identify the children and family members only by their initials or first name.

Ka admitted she had not told her mother about this incident, but she thought she had "[a]nd when [she] was nine [she'd] just gone with what [she] thought of . . . ."

Ka's sister, Ky, testified next. Ky (who was fourteen years old at trial) testified that from when she was about five years old until she turned twelve years old, appellant would lick her vagina. When she was seven and nine years old, she called that part of her body her "tutu." She said he would put his hands on her breasts. Ky said appellant also put his penis or his fingers inside her vagina. She said appellant would sometimes walk into the bathroom while she was showering. Appellant also would put her hands on his penis and tell her to rub it. Ky thought she was about six years old when she told her mother what was happening, and her mother did not believe her at first. When her mother said she did not believe her, Ky then told her mother that nothing happened because she was afraid appellant would do something. Ky said she told her mother again when she turned twelve years old because that is when she first realized that what appellant was doing was wrong. Ky said on this occasion, her mother had come into her room and asked her if anyone had ever touched her in an inappropriate way. Ky said "[w]e [then] went to school and we came home and we packed our stuff . . . [and] went to Crystal's house."

On cross-examination, Ky admitted she did not like appellant when he and her mother married, and she wanted her mother to get back together with her biological father. Ky also said she told Child Protective Services ("CPS") that she did not tell her mother "nothing happened." In her written statement, Ky stated everything started to happen with appellant when she was nine years old. In a second written statement given five days later, she said everything started when she was five years old. When asked what happened in the five days between the two statements, she explained "[t]his one says he's giving me a bath. And this one said he scared me." When counsel asked her, "[s]o it's just different things that are happening," she responded "yes."

Norma Jordan, who at the time was a sergeant investigator with the Atascosa County Sherriff's Department, testified she met with both girls and their mother, interviewed them, and then referred them to ChildSafe where the girls would be interviewed on video and given a medical examination.

Ka and Ky's mother, Sharla, testified she met appellant when she was a clerk and he was a sergeant at the Dominguez State Jail. They married when she was pregnant with CT, and Ka was five years old and Ky was three years old. She said the first outcry came from Ka when she was six years old. Sharla said she was in the laundry room when Ka "just blurted out that [appellant] had licked her tutu and I completely lost composure and I didn't know what to do." She said she told Ka they had to go to the police station "because I wanted to make sure that she was telling the truth." She said she and appellant had just married, and Ka was lying and getting into trouble at school, "[s]o I thought maybe it was, you know, kind of like an outcry retaliating, I guess, because we got married." She said Ka immediately changed her story to say "she was lying, you know, never mind, I'm just kidding." Nevertheless, Sharla made a report to CPS, and, after the investigation, CPS said Ka showed no signs of sexual abuse and dismissed the case.

Sharla became suspicious later when Ky's grades began to decline. Sharla said one day Ky's school principal called to say Ky had been in a fight at school. After some time passed, when Ky was nine years old, Sharla again noticed "some things that were occurring" with both Ky and Ka. Sharla decided to ask Ky if anyone had ever inappropriately touched her, and Ky responded that appellant had. Sharla then called Crystal and asked her to pick up Ky so that she [Sharla] could talk to Ka. Sharla then asked Ka if appellant had ever inappropriately touched her, and Ka said "yeah, Mom, I told you when I was six years old . . . ." Sharla then took Ka and CT to Crystal's house where she called CPS. The next day, Sharla went back to the house she shared with appellant and packed up all their belongings. They stayed at Crystal's house until the girls

-4-

finished the school year, and then they moved in with Sharla's mother with whom they lived for about a year until Sharla and the girls moved into their present house.

Sharla said that, when she and appellant were married, the family lived in a mobile home first, but later moved to a large house that was purchased for them by appellant's mother. Sharla explained that appellant's mother bought lottery tickets, gave each of her grandchildren a ticket to scratch off, and the ticket scratched off by Ky won the grandmother $2 million. Sharla said that because Ky scratched off the winning ticket, appellant's mother used some of the money to buy the large house as a gift for appellant and his family. When asked by the prosecutor whether she had ever (1) asked for money to make the case go away, (2) put ideas into the girls' heads, or (3) specifically spoke to the girls about what happened other than the initial outcry; Sharla replied "No."[2] Sharla denied asking for money for breast augmentation, liposuction, or a tummy tuck. She said she and appellant were still married and would not divorce until after the criminal trial. When asked whether she felt she was entitled to the house because Ky had the winning lottery ticket, Sharla denied thinking she was entitled to the house but she stated "when any of the other kids won $20, it was their $20. So why would it make a difference whether it was $2 million or $20." She admitted she felt she was entitled to a portion of the winnings.

The next witness to testify was Ginger Jordan, the sexual assault nurse examiner ("the SANE nurse") who was employed at ChildSafe and conducted the examination and evaluation of both Ka and Ky. Jordan said both girls were easy to speak with and cooperative. Ka told Jordan appellant first touched her when she was five years old, had just showered, and was lying on her bed "air drying" when appellant came into her room and started to touch her genitals. Ka told Jordan the last incident occurred when she was ten or eleven years old and appellant put his mouth

_____

[2] The prosecutor prefaced these questions with the statement: "Let's talk a little bit about some things that have [been] said to the jury."

on her genitals. She said this happened "a lot." Ka did not mention digital penetration or that appellant touched her breasts. Jordan said the results of Ka's medical examination were all normal, but she did not find that unusual because tissue in the genital area heals very quickly. No rape kit was done because more than a year had passed since the last incident.

Ky told Jordan appellant touched her with his hands more than once and had asked her to rub him. Ky did not mention digital penetration or any genital-to-mouth touching. Jordan said the results of Ky's medical examination were all normal, but she did not find that unusual because in the majority of exams she has done in the past, most results are normal.

Next, Dr. Nancy Kellogg, a child abuse pediatrician, testified she was the medical director at ChildSafe when Ka and Ky were examined. Kellogg stated that most of the children seen at ChildSafe have a normal examination, with only about ten percent having any medical findings. Kellogg explained children often do not outcry immediately because they are afraid, or they do not know what will happen to their family. She said if a child must tell multiple people what happened, it is not uncommon for the child to tell a slightly different story each time, especially if the people asking the questions all have a different purpose for their questions.

Caroline Briones, the forensic interviewer at ChildSafe, testified next. Briones described Ka as reserved, shy, and hesitant. She described Ky as more forthcoming.

The State's final witness was DT, appellant's daughter from his first marriage. The trial court had earlier ruled DT could testify to rebut a defensive theory. At the time of trial, DT was eighteen years old, and lived with her mother and step-father. DT could not remember when her mother and appellant divorced, but she thought she might have been as young as four. After the divorce, she saw appellant every other weekend and for the month of July. She testified appellant "sexually molested" her when she was a child by kissing her and touching her vagina. She said the "inappropriate things" began before the divorce but she was too scared to tell anyone because

appellant threatened to kill her mother. DT admitted she had accused her step-uncle of touching her inappropriately because she was afraid appellant would do something to her mother and "so [she] tried to blame it on someone else, and he [the step-uncle] hadn't. But [she] said he had so they'd pay attention to [her] and take [her] to the doctor."

DT said appellant once asked her to masturbate him while he watched pornography, he would also kiss her, put his finger inside her, and get into the shower with her. DT said appellant touched her from the time she was little until he married Sharla. DT said she never spoke with Ka or Ky about what appellant did to her. She said they did not all get together and make anything up or coordinate their stories. At some point in time, Sharla asked DT's mother "if anything had ever happened," which then caused DT's mother to ask DT whether appellant had ever touched her. DT told her mother that he had. DT then had her interview at ChildSafe. On cross-examination, DT said she asked Briones, during her interview, whether appellant would go to jail because she did not think he should be free.

Appellant called two witnesses during his case-in-chief. One of the witnesses, Beverly Holland, a former friend of Sharla's, testified Sharla was a liar. When she first heard about the abuse, she was shocked and "almost thought he did it." But this initial perception changed because appellant was always with Beverly's own children and she was always with his children, and the children were in constant contact. She believed she was close enough to Ka and Ky that they would have told her if appellant had done something to them. The other witness, Nelda Diaz, a friend of appellant's mother, said she would visit with Ka and Ky when they came to visit their grandmother. Diaz said she believed if there had been anything wrong, the girls would have said something to their parents or grandparents.

Finally, appellant testified on his own behalf. He said his divorce from DT's mother was not "a very friendly divorce." He said he and his former wife had differences over disciplining

DT and, once, he and DT's step-father had a physical altercation. After this, his relationship with DT deteriorated. Appellant said DT, Ka, and Ky did not get along well together, and he thought DT saw the two younger girls as outsiders who took attention away from her. Appellant said Ka never accepted him as part of the family, but he and Ky got along.

Appellant denied ever penetrating or inappropriately touching DT, Ka, or Ky. On cross-examination, appellant was asked why everyone would lie and whether money was the reason:

Q. All of them are lying?
A. Yes, ma'am.
Q. For what reason? Money?
A. That's a theory.
Q. That's your theory?
A. Correct.
Q. How much money do you have, Mr. Tucker?
A. Not much.
. . .
Q. Okay. What money do you have that they're after?
A. I don't have any money.
Q. So how do we get to this theory of these girls have [sic] said all these things about you? For whose money?
A. I have access to my mom's money.
Q. Does your mom just funnel it to you freely?
A. Yes, ma'am.
Q. And so you think that's how they think they're going to get it?
A. I can't answer that. I don't know.
Q. It's your theory?
A. It's my theory.
Q. Explain it.
A. Part of the theory that this would back up is the fact that during the preliminary portion of Sharla's and [my] divorce Sharla was expecting 16 to 18 hundred dollars a month for one child and spousal support.
Q. Okay. So your theory is that she was expecting or wanting a large amount of money?
A. Yes, ma'am.
Q. For child support or spousal support?
A. Yes, ma'am.
Q. So Sharla went and got her daughters to make up a story.
A. That's a theory.
Q. That's your theory?
A. Yes, ma'am.
. . .

Q.    Okay. Does it sound reasonable to you that [Ka and Ky] would go and tell law enforcement what happened, go to ChildSafe and tell them what happened, talk to Ginger Jordan and tell them what happened, come here and tell twelve strangers what happened over $1,600 or $385?

A.    I don't know.

Q.    Well, you have to know. It's your theory. Does that sound reasonable to you?

A.    I think they were influenced by their mother then, yes.

On re-direct examination, appellant answered affirmatively when asked if he thought there were abandonment issues, feelings of rejection, and feelings that he was a "lousy father." He agreed it was not unreasonable for a child to side with a care-giving mother.

## ADMISSION OF DT'S TESTIMONY

Before DT testified, the trial court heard arguments about the admissibility of her testimony. The State argued it wanted to bring in DT's testimony to rebut appellant's defensive theory that Ka and Ky had been coached for financial gain on the premise that DT, who was not under Sharla's influence, testified to a similar sexual assault by appellant. Over appellant's objection, the trial court allowed her testimony.

We first address appellant's two complaints that the trial court erred in admitting DT's testimony on the grounds that appellant did not open the door to its admission, and the prejudicial effect of DT's testimony outweighed its probative value. We review a trial court's decision to admit evidence under an abuse of discretion standard. *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003). If the trial court's ruling is within the zone of reasonable disagreement, we will affirm. *Id.*

## A.    Opening the Door

Appellant asserts trial counsel's opening statement outlined evidence he believed the jury would hear at trial, including evidence that Sharla was using the criminal case to improve her position in the couple's pending divorce and that Sharla was using the girls as leverage to get

- 9 -

money. However, appellant contends, counsel's strategy later shifted and counsel did not introduce the hinted-at evidence. Therefore, appellant concludes the door was never opened to allow DT's testimony to rebut a defensive theory because no such theory was advanced. We disagree.

"Although a defensive opening statement is not itself evidence, it does inform the jury of 'the nature of the defenses relied upon and the facts expected to be proved in their support.'" *Bass v. State*, 270 S.W.3d 557, 563 n.7 (quoting TEX. CODE CRIM. PROC. ANN. 36.01(a)(5) (West 2007)). "[A] defense opening statement, like that made in this case, opens the door to the admission of extraneous-offense evidence, like that admitted in this case, to rebut the defensive theory presented in the defense opening statement." *Id.*; *see also Powell v. State*, 63 S.W.3d 435, 438-40 (Tex. Crim. App. 2001) (in prosecution for indecency with a child, defendant's opening statement that he lacked opportunity to molest the complainant under the circumstances of the charged offense opened the door to admission of extraneous-offense evidence that defendant molested others under almost identical circumstances to rebut defendant's lack of opportunity defensive theory).

Even if counsel's opening statement did not open the door to DT's testimony, we disagree with appellant's contention that his defensive theory never materialized at trial. Appellant's entire defense rested on his contention that Ka and Ky lied. As support for this contention, he testified Ka never accepted him as part of the family, money was his theory for why everyone lied because Sharla knew he had access to his mother's money, and Sharla got the girls to fabricate their stories.

Under these circumstances, we conclude appellant opened the door to DT's testimony.

**B.  Probative Value**

Texas Rule of Evidence 401 provides that evidence is relevant if it makes the existence of a fact that is of consequence to the determination of the action more probable than it would be without the evidence. TEX. R. EVID. 401. However, even relevant evidence is not admissible for

every purpose. *Moses*, 105 S.W.3d at 626. Rule of Evidence 404(b) allows evidence of extraneous offenses if the evidence has relevance apart from character conformity. *Id.*; *see* TEX. R. EVID. 404(b). Thus, evidence of other crimes, wrongs, or acts may be admissible to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b); *see Moses*, 105 S.W.3d at 626. Rebuttal of a defensive theory is also one of the permissible purposes for which relevant evidence may be admitted under Rule 404(b). *Moses*, 105 S.W.3d at 626.

Appellant first contends the probative value of DT's testimony is inextricably linked to how well appellant's defensive theory was presented. According to appellant, his defensive theory was not supported by the evidence; therefore, DT's testimony had minimal probative value. As stated above, appellant's entire defense rested on his contention that Ka never accepted him as part of the family, money was his theory for why everyone lied because Sharla knew he had access to his mother's money, and Sharla got the girls to fabricate their stories. Appellant's testimony, coupled with Sharla's admission that she felt she was entitled to a portion of appellant's mother's lottery winnings, sufficiently raised the defensive issue that Sharla influenced the girls to lie about the charges against appellant. Therefore, DT's testimony was probative to rebut this defensive theory.

## C. Prejudicial Effect

Even if evidence is relevant under Rule 401 and the purpose for which it is being offered is permissible under Rule 404(b), the evidence still may be excluded under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *Id.*; *see* TEX. R. EVID. 403. When the trial court exercises its discretion not to exclude the evidence by finding that the probative value of the evidence is not outweighed by the danger of unfair prejudice, we give deference to this decision. *Moses*, 105 S.W.3d at 627. We cannot substitute our own decision for

- 11 -

that of the trial court. *Id.* Therefore, in determining whether the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, we do not conduct a de novo review and we "should reverse the judgment of the trial court rarely and only after clear abuse of discretion." *Id.* (quotations omitted).

When conducting a Rule 403 analysis, courts must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641-42 (Tex. Crim. App. 2006). It is the objecting party's burden to show that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. *Poole v. State*, 974 S.W.2d 892, 897 (Tex. App.—Austin 1998, pet. ref'd).

"'[P]robative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence." *Gigliobianco*, 210 S.W.3d at 641. When the proponent of the evidence has other compelling or undisputed evidence to establish the proposition or fact that the evidence goes to prove, the probative value of the evidence will weigh far less than it otherwise might in the probative-versus-prejudicial balance. *Id.* For the reasons stated above, the trial court could have reasonably concluded the inherent probative force of the testimony of DT—who was not under Sharla's influence—was considerable because her testimony rebutted appellant's defensive theory that Sharla influenced Ka and Ky to

- 12 -

fabricate their allegations against him. For this same reason, the trial court could have reasonably concluded the State needed DT's testimony.

We agree that DT's testimony was prejudicial. But, under Rule 403, mere prejudice will not render the evidence inadmissible; instead, the admission of the evidence must be unfairly prejudicial. *See* TEX. R. EVID. 403. Unfair prejudice "refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *Gigliobianco*, 210 S.W.3d at 641. For example, evidence might be unfairly prejudicial if it invokes the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Id.* In view of Ka's and Ky's testimony, which appellant concedes on appeal was "nearly unscathed by impeachment"—the trial court could have reasonably concluded that DT's testimony did not "unfairly" prejudice appellant. We also note the trial court instructed the jury both before DT testified and again in the jury charge that they could consider DT's testimony only for the purpose of impeaching a defensive theory. We presume the jury obeyed these instructions. *See Resendiz v. State*, 112 S.W.3d 541, 546 (Tex. Crim. App. 2003) (appellate courts presume jury follows instructions). Because the court did what it could to mitigate the improper influence of DT's testimony, the third factor at most only somewhat favors exclusion.

"Confusion of the issues" refers to a tendency to confuse or distract the jury from the main issues in the case. *Id.* For example, evidence that consumes an inordinate amount of time to present or answer might tend to confuse or distract the jury from the main issues. *Gigliobianco*, 210 S.W.3d at 641. DT's testimony was straight-forward and did not take an inordinate amount of time; therefore, this factor favors admission of the evidence.

"Misleading the jury" refers to a tendency of an item of evidence to be given undue weight by the jury on other than emotional grounds. *Id.* For example, scientific evidence might mislead a jury that is not properly equipped to judge the probative force of the evidence. *Id.* DT's

testimony was not prone to this tendency because it concerned matters easily comprehensible by laypeople. Thus, this factor weighs in favor of admission.

Finally, "undue delay" and "needless presentation of cumulative evidence," concern the efficiency of the trial proceeding rather than the threat of an inaccurate decision. *Id.* DT was on the stand for a relatively brief period of time; her testimony occupies only about twenty-eight pages of a trial transcript that spans almost 125 pages. *Cf. Lane v. State*, 933 S.W.2d 504, 520 (Tex. Crim. App. 1996) (factor weighed in favor of admission where extraneous-offense testimony amounted to "less than one-fifth" of trial testimony). Furthermore, her testimony was not repetitive. Therefore, this factor weighs in favor of admission.

In sum, only one factor weighed against admitting DT's testimony. In such a situation, especially bearing in mind that Rule 403 "envisions exclusion of evidence only when there is a clear disparity between the degree of prejudice of the offered evidence and its probative value," *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009), the trial court could have reasonably concluded the probative value of DT's testimony was not outweighed by the danger of unfair prejudice. Thus, we cannot say that the trial court abused its discretion by admitting the testimony.

## SUFFICIENCY OF THE EVIDENCE

Appellant asserts the evidence is legally insufficient to support the four counts on which the jury found him guilty because the evidence consisted entirely of inconsistent testimony.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found the essential elements of the charged offenses beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). We examine legal sufficiency under the direction of the *Brooks* opinion while giving deference to the responsibility

of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318-19).

The testimony of a child victim alone is sufficient to satisfy each element of the charged offense and support a conviction for aggravated sexual assault or indecency with a child. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a) (West Supp. 2013); *Hiatt v. State*, 319 S.W.3d 115, 121 (Tex. App.—San Antonio 2010, pet. ref'd). Also, "[c]hild victims of sexual crimes are afforded great latitude when testifying and they are not expected to testify with the same clarity and ability as is expected of a mature and capable adult." *Hiatt*, 319 S.W.3d at 121. In this case, although there may have been inconsistencies in Ka's and Ky's testimony, it was for the jury to resolve these inconsistencies, and the jury could choose to believe all, some, or none of the testimony presented by the parties. *Zuniga v. State*, 393 S.W.3d 404, 413 n.2 (Tex. App.—San Antonio 2012, pet. ref'd). We conclude, after viewing the evidence in the light most favorable to the verdict, that it was rational for the jury to find appellant guilty on the four counts.

## PUNISHMENT PHASE

Appellant raises several complaints about the punishment phase of trial. First, appellant complains the trial court erred when it denied his motion for new trial because the jury engaged in misconduct when it assessed his punishment by considering DT's extraneous offense testimony when there was no instruction in the punishment charge limiting use of her testimony. Second, appellant complains the trial court erred by not sua sponte including an extraneous evidence instruction in the punishment charge, and the error caused him egregious harm.

### A. Juror Misconduct

In the guilt/innocence charge, the jury was instructed that DT's testimony could be considered only if the jury believed DT beyond a reasonable doubt, and then only for the purpose

- 15 -

of rebutting a defensive theory. The punishment charge contained no such instruction, and the jury was not instructed it could consider DT's testimony for the purpose of enhancing appellant's punishment. On appeal, appellant contends the jury engaged in misconduct when it used DT's testimony to enhance his punishment. Appellant had the burden of proving the allegation of juror misconduct. *Hughes v. State*, 24 S.W.3d 833, 842 (Tex. Crim. App. 2000). To prove juror misconduct, the defendant must establish that: (1) misconduct occurred; and (2) the misconduct resulted in harm to the defendant—that is, was detrimental to him. *Garza v. State*, 630 S.W.2d 272, 274 (Tex. Crim. App. 1982); *Escobedo v. State*, 6 S.W.3d 1, 8 (Tex. App.—San Antonio 1999, pet. ref'd).

Appellant relies on the testimony of the jury foreman, Jose Herrera, during the hearing on his motion for new trial for his contention that the jury engaged in misconduct by considering DT's testimony and disregarding the limiting instruction that her testimony be considered only to rebut a defensive theory when deliberating on his punishment. According to appellant, DT's testimony constituted outside evidence and an outside influence. At the new trial hearing, appellant's counsel first asked Herrera whether he remembered a special instruction regarding DT's testimony:

> A. I don't remember that. I don't think — I think we — we could not use [DT's] testimony whatsoever. We couldn't use her testimony for no reason other than I think dealing with the — with the punishment part is the only time we could use her testimony from what I recall.
>
> Q. Well, the record reflects otherwise, sir. The record reflects that there was a jury charge given in guilt/innocence . . . that said if you believe beyond a reasonable doubt that person's testimony . . . then it can be considered to rebut the defendant's theory that the other girls were lying. Do you know whether or not it was used for that purpose?
>
> A. From what I can remember we did not use [DT's] testimony whatsoever to determine whether the defendant was guilty or not guilty.
>
> Q. Was it discussed?

A. It was not discussed until the punishment phase of our deliberation[s] came into play.

Q. So you used it to sentence him?

A. Yes.

. . .

Q. Okay. All right. Just to back up then just based on what you remember. So what you're saying is that the jury only considered her testimony for punishment?

A. Exactly.

. . .

Q. Okay. So do you feel that [DT's] testimony that she was also victimized did it lead to additional years in his sentence?

A. Yes.

Following the hearing, the trial court denied appellant's motion for new trial.

The State asserts Texas Rule of Evidence 606 bars consideration of Herrera's testimony. Rule 606 provides generally that a juror may not testify "as to any matter or statement occurring during the course of the jury's deliberations, or to the effect of anything on any juror's mind or emotions or mental processes, as influencing any juror's assent to or dissent from the verdict or indictment." TEX. R. EVID. 606(b). "Nor may a juror's affidavit or any statement by a juror concerning any matter about which the juror would be precluded from testifying be admitted in evidence for any of these purposes." *Id.*

However, the State did not object during the new trial hearing to Herrera's testimony. Therefore, the applicability of Rule 606(b) is not before us and we will consider Herrera's testimony. *See Bader v. State*, 777 S.W.2d 178, 180-81 (Tex. App.—Corpus Christi 1989, no pet.) (holding same); *see also Lee v. State*, 791 S.W.2d 141, 142 n.* (Tex. Crim. App. 1990) ("It may be the court of appeals did not consider admissibility of the evidence under Rule 606(b), supra, for

the simple reason that the State waived any objection on that basis. If that is the case, the court of appeals should make its rationale more explicit upon remand.").

Because DT did not testify during the punishment phase, we cannot say it was error to "admit" her testimony. Appellant's argument on appeal, instead, focuses on the manner in which her testimony was considered. Appellant first asserts the jury engaged in misconduct by considering DT's testimony because her testimony was "outside evidence" and an "outside influence." We disagree because DT's testimony was offered during the guilt/innocence phase. *See McQuarrie v. State*, 380 S.W.3d 145, 154 (Tex. Crim. App. 2012) (defining "outside influence" as used in Rule of Evidence 606(b) as "something originating from a source outside of the jury room and other than from the jurors themselves").

Also, extraneous offense evidence may be offered during the punishment phase. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a)(1) (West Supp. 2013). Appellant does not argue on appeal that DT's testimony would not have been admissible during the punishment phase of his trial. The punishment charge allowed the jury to consider "all facts shown by the evidence admitted in evidence . . . in the full trial . . . ." Therefore, under these circumstances, we do not consider DT's testimony to be either "outside evidence" or an "outside influence."

We next consider appellant's argument that his motion for new trial should have been granted because the jury used DT's testimony to enhance his punishment, rather than to impeach a defensive theory. The State asserts the questioning of Herrera by appellant's attorney (the State asked no questions), did not go far enough in describing what or how the jury used DT's testimony in assessing punishment. We do not agree with the State's contention because Herrera unequivocally testified DT's testimony resulted in additional years added to appellant's punishment. However, we do not agree with appellant that the trial court erred in denying his

motion for new trial because, on this record, even if the jury improperly considered DT's testimony, we conclude appellant did not establish harm.

"The sentencing process consists of weighing mitigating and aggravating factors, and making adjustments in the severity of the sentence consistent with this calculus." *Milburn v. State*, 15 S.W.3d 267, 270 (Tex. App.—Houston [14th Dist.] 2000), *vacated and remanded on other grounds*, 3 S.W.3d 918 (Tex. Crim. App. 1999). Article 37.07, section 3(a)(1) allows for admission of any evidence the trial court "deems relevant to sentencing." TEX. CODE CRIM. PROC. art. 37.07 § 3(a)(1). "The Legislature has expressly provided that 'relevant' punishment evidence includes, but is not limited to, both character evidence in the form of opinion testimony as well as extraneous-offense evidence." *Sims v. State*, 273 S.W.3d 291, 295 (Tex. Crim. App. 2008). "Because there are no discrete fact issues at the punishment phase of a non-capital trial . . . the definition of 'relevant,' as stated in Rule 401 of the Texas Rules of Evidence, does not readily apply to Article 37.07." *Id.* "What is 'relevant' to the punishment determination is simply that which will assist the fact finder in deciding the appropriate sentence in a particular case." *Id.* "When the jury assesses punishment, it must be able to tailor the sentence to the particular defendant, and relevance is simply 'a question of what is helpful to the jury in determining the appropriate sentence for a particular defendant in a particular case.'" *Id.*

Nothing in Herrera's testimony indicates the degree to which appellant's punishment was enhanced based upon DT's testimony. As discussed in more detail below, the jury assessed punishment on the two most serious counts—aggravated sexual assault—at less than the maximum, and did not assess fines on any of the four counts. Also, the evidence, even without DT's testimony, was more than sufficient to justify the sentences. On this record, we cannot conclude the trial court abused its discretion in denying appellant's motion for new trial based on juror misconduct.

## B. Jury Instruction

Appellant next asserts the trial court erred by not sua sponte instructing the jury in the punishment charge that it could consider evidence of two extraneous offenses only if the jury believed the testimony about the extraneous offenses beyond a reasonable doubt. Appellant contends this error caused him egregious harm.

DT's testimony was the only evidence of an extraneous offense presented during the guilt/innocence phase. In the guilt/innocence charge, the jury was instructed that it could not consider any extraneous offense evidence "for any purpose unless you find and believe beyond a reasonable doubt that the defendant committed such other offenses, if any were committed, and even then you may only consider the same for the purpose of impeaching a defensive theory, if any, of the defendant in connection with the offense, if any, alleged against him in the indictment in this case, and for no other purpose." The punishment charge did not contain any specific limiting instruction, but instructed the jury that it "may take into consideration all the facts shown by the evidence admitted in evidence before you in full trial of this case and the law as submitted to you in this charge." During the punishment phase, Sharla testified she saw videos of men having sex with children on appellant's laptop computer,[3] and Herrera testified the jury considered DT's testimony during the punishment phase. Under these circumstances, appellant contends the trial court should have sua sponte included an extraneous evidence instruction in the punishment charge.

Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal.

---

[3] Sharla did not testify about the videos during the guilt/innocence phase.

- 20 -

*Id.* at 731-32. Section 3 of Texas Code of Criminal Procedure article 37.07 provides that, during the punishment phase of trial,

> evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to . . . any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. art. 37.07 § 3(a)(1).

Article 37.07 also requires that the charge to the jury at punishment include any "additional written instructions as may be necessary." *Id.* § 3(b). Although section 3(a) of article 37.07 does not expressly require a jury instruction regarding evidence of unadjudicated extraneous offenses admitted at the punishment phase of trial, such an instruction is "logically required" to enable the jury to properly consider such evidence under the article's prescribed reasonable-doubt standard. *Huizar v. State*, 12 S.W.3d 479, 484 (Tex. Crim. App. 2000).

Section 3(a)(1)'s requirement that the jury be satisfied of the defendant's culpability in the extraneous offenses and bad acts is the "law applicable to the case" in the non-capital punishment context. *Id.* at 483-84 (noting that "the law applicable to the case" requires sua sponte submission); *see* TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007) (requiring trial court to deliver to the jury "a written charge distinctly setting forth the law applicable to the case"). Therefore, we conclude the trial court's failure to include a reasonable doubt instruction was error. Because appellant failed to object to the written charge, we next examine the record to determine whether he suffered "egregious harm."

Appellant contends the trial court's failure to include a limiting instruction resulted in egregious harm because the jury increased his sentence. Appellant contends his sentence on two

counts at the maximum penalty and near the maximum penalty on two other counts was not the result of a fair and impartial trial.

When, as here, a defendant does not object to the charge error, his convictions are subject to reversal on appeal only if he has suffered "egregious harm." *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984). Egregious harm is established if the record shows that the defendant has suffered "such harm that [his] trial was not fair or impartial." *Id.*; *see Cosio v. State*, 353 S.W.3d 766, 776-77 (Tex. Crim. App. 2011). Charge error is egregiously harmful when it affects "the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Fulcher v. State*, 274 S.W.3d 713, 716 (Tex. App.—San Antonio 2008, pet. ref'd). "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Cosio*, 353 S.W.3d at 777; *Almanza*, 686 S.W.2d at 174. However, "we do not require direct evidence of harm to establish egregious harm." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

When the error is an omission of a reasonable doubt instruction, "[p]ossible harm to appellant because of the admission of evidence of extraneous offenses is not the issue . . . ." *Ellison v. State*, 86 S.W.3d 226, 228 (Tex. Crim. App. 2002). Instead, "[t]he harm which must be considered is the impact of the omission in the jury charge of a reasonable-doubt instruction." *Id.* In *Ellison*, the defendant asserted the trial court erred by failing to instruct the jury sua sponte that, before it could use the extraneous-offense evidence against him, it must first find beyond a reasonable doubt that he had committed the offenses. *Id.* at 226-27. The court of appeals, after applying *Almanza*, held the evidence made the case for serious punishment significantly more persuasive to the jury, and it could not say with fair assurance that the sentence was not substantially affected by the error. *Id.* at 227. The Court of Criminal Appeals held the court of appeals correctly used the egregious-error standard of *Almanza*, but applied it to the wrong issue.

- 22 -

*Id.* The Court noted the "court of appeals' analysis appears to be based on a finding that the error was the admission of the evidence rather than the omission of the reasonable-doubt instruction." *Id.* The Court concluded the court of appeals' "analysis, therefore, [did] not properly apply the factors required by *Almanza* to the question of the impact of the omission of that instruction." *Id.* The Court remanded the cause to the court of appeals for an egregious harm analysis of the impact of the omission of the reasonable-doubt instruction. *Id.*

In assessing whether appellant was egregiously harmed by the omission of a reasonable doubt instruction in the punishment charge, we consider the following factors: (1) the entire jury charge; (2) the state of the evidence, including contested issues and the weight of probative evidence; (3) the parties' arguments at voir dire and at trial; and (4) all other relevant information in the record. *Almanza*, 686 S.W.2d at 171. The *Almanza* analysis is fact specific and is done on a "case-by-case basis." *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013).

### 1. The Punishment Charge

The trial court failed to instruct the jury in its punishment charge to not consider the extraneous evidence unless it was proven beyond a reasonable doubt. However, the charge instructed the jury it could not and must not take into consideration, refer to, or allude to appellant's decision not to testify during the punishment phase. The charge also instructed the jury it was the exclusive judge of the facts proved, of the credibility of the witnesses, and of the weight to be given their testimony, but it was "bound to receive the law from the Court, which is herein given you, and be governed thereby."

### 2. Guilt/Innocence Voir Dire and Closing

During the guilt/innocence phase in the State's voir dire argument, the prosecutor told the jury that the burden never shifted to the defendant and the State had to prove its case beyond a reasonable doubt. The defense asked the jury to keep an open mind about the possibility of

children lying and the possibility of somebody putting a thought into a child's mind. The record reveals nothing remarkable about the State's brief opening statements. The defense began its opening with three words: "Jealousy, greed, revenge." Counsel said "the seed" was planted when Sharla first did not believe Ka's initial outcry, and the jury would hear evidence about how Sharla used the children as leverage to get money in their still-pending divorce. Counsel also told the jury Sharla realized appellant did not have the money; instead, his mother had the money.

During the State's closing argument during the guilt/innocence phase, the State explained to the jury why it heard from DT: "Because where is the jealousy, greed and revenge that you heard about in opening statement? If that is from Sharla then why in the world would that have anything to do with what he did to DT? And that is why she was allowed to come in and tell you. Because it's allowed to rebut his theory. Because it's bull. She isn't even close to [Ka and Ky]." In his closing, defense counsel reminded the jury that only Ky and Ka were mentioned in the indictment. Counsel also reminded the jury it was not the defense's burden to show why Ky or Ka would lie, and if they did not believe the girls, then they could not convict simply because they believed DT. Counsel said Sharla "was always about getting money from this family." Counsel said the case against appellant relied entirely on the word of Ky and Ka, and "Mom has a motive to coach." Finally, defense counsel focused a significant portion of closing on DT and how the jury should not consider her testimony for the purpose of convicting appellant.

### 3. Punishment Closing

During its first punishment phase closing argument, the State began by telling the jury it could consider what appellant did to DT, Ka, and Ky over their lifespan when it was determining the appropriate amount of time that appellant deserved to spend in prison. The prosecutor then told the jury it could also consider Sharla's testimony about the child porn appellant had on his

computer before Ky outcried. The prosecutor said Sharla did not want to believe what appellant was capable of, and "[a]s a mother I find that incredible, but it happened."

Defense counsel appealed to the jury by reminding them of testimony from a jailer about how individuals convicted of aggravated sexual assault of a child and indecency with a child are treated in prison, and that five years "could be a death sentence in and of itself." Counsel said he was "okay" with the jurors believing the children, but he urged the jurors not to associate Sharla's testimony about the computer with assessing a higher punishment.

After defense counsel closed, the State again argued. The prosecutor told the jury appellant "has to be punished for what he's done, for the lives he's ruined, for all of them, for [Ka, Ky, and DT]." As to Sharla's testimony, the prosecutor told the jurors "[y]ou can say whatever you want about Sharla. I don't care, whatever you want to say about her. She should have, she could have, she would have, she didn't. . . . This isn't about Sharla. It's about that pedophile right there who likes little tiny girls." The prosecutor also stated, appellant "had at least, at least, 14 or 15 years of doing whatever he wanted to [DT], and then to [Ka] and then to [Ky] with no one stopping him."

### 4.    The Evidence

In addition to the evidence we have reviewed above, the jury also heard during the punishment phase testimony from Sharla about what she saw on appellant's computer, and testimony from five witnesses who testified on appellant's behalf. These five witnesses all characterized him as a good man who could never commit such crimes. Two of the witnesses, who had children, said they would trust appellant around their own children. One of the witnesses, Ashley Everett, described appellant "as the love of [her] life," and she said "it's a tragedy that he is caught up in a mess with carnival-like people." She also said DT "bragged [on her public Facebook page] about what she's doing to her father."

### 5. Other Circumstances

"In addressing other relevant information, we may consider the severity of the punishment assessed, which may indicate egregious harm in some situations." *Martinez v. State*, 313 S.W.3d 358, 369 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (appellant received life sentence, the maximum allowed). "However, a maximum punishment alone does not indicate egregious harm." *Id.* (holding there is no egregious harm if jury would still have assessed life sentence, even if properly instructed to consider only extraneous offenses if they first found that appellant committed those offenses beyond a reasonable doubt).

In this case, the punishment charge informed the jury that punishment for aggravated sexual assault of a child was for a term of not less than five years nor more than life or ninety-nine years, with a possible fine not to exceed $10,000. The punishment charge informed the jury that punishment for indecency with a child by contact was for a term of not less than two years nor more than twenty years, with a possible fine not to exceed $10,000. The jury was told that in fixing punishment, it could consider all the facts shown by the evidence admitted in the full trial and the law as it was submitted to them. The jury assessed punishment on the aggravated sexual assault charges at seventy-five years' confinement for each of the two counts, with no fine. The jury assessed punishment on the indecency with a child by contact charges at twenty years' confinement for each of the two counts, with no fine.

### 6. Conclusion

As noted above, our harm analysis does not focus on whether appellant was egregiously harmed by the admission of DT's testimony. *See Ellison*, 86 S.W.3d at 227-28. Instead, we analyze whether appellant was egregiously harmed by the omission of the reasonable doubt instruction in the punishment charge. *Id.* We do not believe he was. The jury heard the reasonable doubt/limiting instruction as to DT's testimony, albeit in the guilt/innocence charge. Although

Sharla's testimony during the punishment phase was not subject to a reasonable doubt instruction, both the State and defense were somewhat dismissive of her testimony in closing arguments. The jury assessed punishment on the two most serious counts—aggravated sexual assault—at less than the maximum, and did not assess fines on any of the four counts. And, the evidence, even without DT's and Sharla's testimony, was more than sufficient to justify the sentences. Had the proper instruction been included, the State's case would not have been any less persuasive. Therefore, we conclude the omission of the reasonable doubt instruction in the punishment charge did not egregiously harm appellant. Accordingly, we cannot conclude the trial court abused its discretion in denying appellant's motion for new trial based on the omission of the instruction.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Appellant next asserts he received ineffective assistance of counsel because his trial attorney failed to fully convey the details of a twenty-year plea bargain, which appellant contends is "reasonably likely" he would have accepted.

At the hearing on appellant's motion for new trial, trial counsel testified he could not recall if he relayed an offer of eighteen or twenty years, but he thought it was eighteen with the aggravated charge. Counsel thought there was a prior offer of twenty-five years, which was rejected. Counsel testified the second offer (of either twenty or eighteen years) was extended "only because we needed [appellant] to consider something. He wouldn't consider any term as being acceptable. Any prison term, whether it was the minimum or not, was unacceptable." Counsel reiterated appellant "was of the position, that any day in jail would be a death sentence. And so we were not willing to compromise that issue. We were not willing to accept anything, [appellant] was not willing to accept anything that involved any type of prison time." Counsel agreed that a prison term was "the only thing the State ever offered." The only offer defense counsel relayed to the State was that appellant would accept probation on a non-sex-related offense, because appellant

did not want to register as a sex offender. During her argument, the prosecutor stated there were no offers from the State that fell below twenty or twenty-five years, and the only offer from appellant was for probation on a non-sex-related offense.

Appellant testified at the new trial hearing, and he stated the first offer relayed to him was for "thirty years aggravated." He said he told counsel it would not be necessary to discuss any plea bargains if "the numbers are going to be sky high." Appellant said he would have accepted a plea bargain for a lesser charge if one had been explained to him. Appellant agreed he "would have considered a lesser charge knowing that that may not carry a 3G aggravated designation."[4] Appellant could not recall discussing an eighteen or twenty year offer.

Based on this record, we cannot conclude appellant satisfied his burden of proof. To determine deficient performance, we look to the totality of the representation and the particular circumstances of each case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). The issue is whether counsel's assistance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland v. Washington*, 466 U.S. 688-89 (1985). Our review of counsel's performance is highly deferential, and we indulge a strong presumption that counsel's conduct fell within a wide range of reasonable representation. *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005). In the plea-bargain context and to show the required but-for prejudice, a defendant must show that the outcome of the plea process would have been different with competent advice. *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012). When a plea-bargain offer is rejected based on bad legal advice, the requisite prejudice is shown if the defendant shows by a reasonable probability that (1) he would have accepted the earlier offer if

---

[4] Texas Code of Criminal Procedure article 42.12, section 3g(a)(1) refers to certain enumerated felonies, including aggravated sexual assault and indecency with a child. A 3G felony carries certain consequences to the accused due to the serious nature of the offense. For example, a person convicted of a 3G felony offense is not eligible for community supervision from the judge. *See* TEX. CRIM. CODE PROC. ANN. art. 42.12 § 3g(a) (West Supp. 2013).

counsel had not given ineffective assistance, (2) the State would not have withdrawn the offer, and (3) the trial court would not have refused to accept the plea bargain. *Id.* at 1385; *Ex parte Argent*, 393 S.W.3d 781, 784 (Tex. Crim. App. 2013). "Both the performance and prejudice prongs of the *Strickland* ineffectiveness inquiry are mixed questions of law and fact, but the prejudice prong often contains 'subsidiary questions of historical fact, some of which may turn upon the credibility and demeanor of witnesses.'" *Riley v. State*, 378 S.W.3d 453, 458 (Tex. Crim. App. 2012). "Appellate courts must show almost total deference to a trial court's findings of historical facts as well as mixed questions of law and fact that turn on an evaluation of credibility and demeanor." *Id.*

Although trial counsel's memory of the plea process was at times unclear, nothing in the record overcomes the strong presumption that counsel's performance was reasonable under all the circumstances and prevailing professional norms at the time of the alleged error. Also, trial counsel clearly stated appellant would not have accepted any offer that included jail time, while appellant contended he would have considered a lesser charge that may not carry a 3G aggravated designation. The prosecutor stated no offer from the State fell below at least twenty years. Deferring to the trial court's credibility finding, we conclude appellant has not shown he would have accepted any plea offer that included jail time or that trial counsel gave ineffective assistance.

## JURY ARGUMENT DURING GUILT/INNOCENCE PHASE

Appellant asserts the prosecutor engaged in improper jury argument during the guilt/innocence phase by shifting the burden of proof to appellant. In defense counsel's opening statement, counsel argued that Sharla fabricated and implanted the alleged abuse into Ky's and Ka's heads in order to extort a large sum of money from appellant. During the State's closing, in response to the argument that the girls were coached by their mother, the prosecutor stated:

Nothing that they told you on the stand is inconsistent. Nothing. They have been saying their same story from the beginning. Licking me, touching me, putting his penis in me. All of that has stayed the same.

And Dr. Kellogg even told you. When we had Dr. Kellogg up here she said that she's examined 9,000 children. Disclosure is a process. It depends on who you're talking to. I may just tell a little bit because I don't know what you're going to say. I'm five, I'm eight, I'm nine. And then I may tell you a little bit more. But none of what they're saying is any different. They've just been able to give you more details.

*And so in order to find that this did not happen you have to find that this was coached, that this was an elaborate scheme . . . .*

At this point, defense counsel objected "misstatement of the law," and the trial court responded "[t]he jury will consider the charge of the court as to the law and the evidence that they heard." On appeal, appellant asserts the above emphasized language did not fall within the four acceptable areas of jury argument, and the trial court erred by not sustaining his objection. Appellant contends the argument shifted the burden of proof to him by suggesting to the jury that he had to prove his defensive theory in order to obtain a not guilty verdict, especially when he contends he did not present a defensive theory.

Permissible jury argument falls into one of four areas: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) an answer to the argument of opposing counsel; or (4) a plea for law enforcement. *Cannady v. State*, 11 S.W.3d 205, 213 (Tex. Crim. App. 2000). In examining challenges to a jury argument, we consider the remark in the context in which it appears. *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988).

In his opening argument during the guilt/innocence phase, defense counsel began with "Jealousy, greed, revenge." During her testimony, Sharla denied asking for money to pay for breast augmentation, liposuction, and a tummy tuck; however, she admitted she felt entitled to a portion of her mother-in-law's lottery winnings. During his testimony, appellant said he had a theory that money was the reason everyone lied, and that Sharla had Ka and Ky make up their

stories about him. In closing arguments, defense counsel said "Mom has a motive to coach." Because appellant raised the issue of whether Ka and Ky could be believed, we conclude the prosecutor's remarks were an answer to the arguments made by defense counsel and appellant's own testimony. Therefore, the trial court did not err by not sustaining appellant's objection.

## CONCLUSION

We overrule appellant's issues on appeal and affirm the trial court's judgment.


Sandee Bryan Marion, Justice

Publish



# Fourth Court of Appeals
## San Antonio, Texas

## DISSENTING OPINION

No. 04-12-00602-CR

Michael Jason **TUCKER**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 81st Judicial District Court, Atascosa County, Texas
Trial Court No. 12-03-0067-CRA
Honorable Stella Saxon, Judge Presiding

Opinion by:  Sandee Bryan Marion, Justice
Dissenting Opinion by:  Patricia O. Alvarez, Justice

Sitting:  Karen Angelini, Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed:  October 8, 2014

As noted above, the trial court's failure to sua sponte include an extraneous offense instruction in the charge on punishment was error. *Huizar v. State*, 12 S.W.3d 479, 484–85 (Tex. Crim. App. 2000). However, because I would hold the trial court's failure to include the reasonable doubt instruction resulted in Tucker suffering egregious harm, I respectfully dissent from the court's judgment affirming Tucker's conviction.

### PUNISHMENT PHASE

I limit my discussion of the evidence to the extraneous offenses discussed during the punishment phase of the trial.

## A.   Extraneous Offenses in Question

In addition to DT's testimony regarding additional uncharged sexual assaults offered during the guilt/innocence phase, the State also offered testimony regarding Tucker's possession of child pornography. During the punishment phase, Sharla testified that in July of 2009 she witnessed approximately thirty or forty child pornography videos on Tucker's personal laptop computer. When questioned, Sharla explained that she was satisfied by Tucker's explanation the videos were "accidentally downloaded" and did not pursue the matter further. The laptop, however, was never offered before the jury as it had been previously destroyed.

## B.   Jury Instruction

I agree with the majority's determination that after admitting (1) DT's testimony that Tucker assaulted her and (2) Sharla's testimony that Tucker viewed child pornography, the trial court was required to sua sponte charge the jury that they must believe the evidence beyond a reasonable doubt before using the extraneous offenses in their punishment deliberations. *See Huizar*, 12 S.W.3d at 484–85. Because the alleged error is a statutory violation and Tucker's counsel did not object to the charge, this court applies an egregious harm standard consistent with *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). *See Huizar*, 12 S.W.3d at 484–85.

### 1.   Establishing Egregious Harm

Egregious harm is established if the record shows that the defendant has suffered "such harm that [his] trial was not fair or impartial." *Almanza*, 686 S.W.2d at 171; *see Cosio v. State*, 353 S.W.3d 766, 776–77 (Tex. Crim. App. 2011). Charge error is egregiously harmful when it affects "the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Fulcher v. State*, 274 S.W.3d 713, 716 (Tex. App.—San Antonio 2008, pet.

ref'd). "An egregious harm determination must be based on a finding of actual rather than theoretical harm." *Cosio*, 353 S.W.3d at 777; *Almanza*, 686 S.W.2d at 174. However, "[an appellate court does] not require direct evidence of harm to establish egregious harm." *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

2.     *Tucker's Evidence of Egregious Harm*

a.     Arguments of the Parties

Tucker argues the testimony in question was highly inflammatory. Tucker first points to Sharla's testimony, which he contends was replete with vague, absurd, and seriously flawed allegations. As evidence of the egregious nature of the harm, Tucker asserts the jury was not required to believe Sharla's uncorroborated testimony that Tucker possessed pornographic videos including a video of an infant being raped.

Tucker also contends the record establishes the jury considered DT's testimony during their punishment deliberations and increased Tucker's sentence as a result. Compounding this error, Tucker argues the prosecution not only asked the jury, but "expected" the jury to consider DT as a third victim when assessing punishment.

The State counters that the instruction within the jury's charge in the guilt/innocence phase put them on notice that any extraneous evidence must be believed beyond a reasonable doubt. Relying on *Walker v. State*, 701 S.W.2d 316, 321 (Tex. App.—Austin 1985, pet. ref'd), the State concedes that although "it would be preferable for the trial court to have placed the same instruction in regards to extraneous evidence in both charges," failure to do so is not reversible error. Moreover, the State argues there is no evidence Tucker suffered harm as a result of the missing instruction.

b.      Determination of Harm

The introduction of extraneous offense evidence is "inherently prejudicial, tends to confuse the issues, and forces the accused to defend himself against charges not part of the present case against him." *Sims v. State*, 273 S.W.3d 291, 294–95 (Tex. Crim. App. 2008) (quoting *Pollard v. State*, 255 S.W.3d 184, 187–88 (Tex. App.—San Antonio 2008), *aff'd*, 277 S.W.3d 25 (Tex. Crim. App. 2009)); *accord Carter v. State*, 145 S.W.3d 702, 710 (Tex. App.—Dallas 2004, pet. ref'd). In addition, the jury is naturally inclined to infer guilt to the charged offense from the extraneous offense. *Carter*, 145 S.W.3d at 710; *Russell v. State*, 146 S.W.3d 705, 715 (Tex. App.—Texarkana 2004, no pet.). Thus, when no limiting instruction is given to lessen the prejudice from the extraneous offense evidence, "any prejudice resulting from introduction of the extraneous offense is unabated." *Abdnor v. State*, 871 S.W.2d 726, 738 (Tex. Crim. App. 1994); *accord Ex Parte Varelas*, 45 S.W.3d 627, 633–34 (Tex. Crim. App. 2001).

In assessing whether Tucker was egregiously harmed by the omission of a reasonable doubt instruction in the punishment charge, an appellate court considers the following factors: (1) the entire jury charge; (2) the state of the evidence, including contested issues and the weight of probative evidence; (3) the parties' arguments at voir dire and at trial; and (4) all other relevant information in the record. *Almanza*, 686 S.W.2d at 171. The *Almanza* analysis is fact specific and is done on a "case-by-case basis." *Gelinas v. State*, 398 S.W.3d 703, 710 (Tex. Crim. App. 2013).

(1)     Jury Charge

In the guilt/innocence phase, the trial court's charge included an instruction to the jury that any extraneous offenses had to be proved beyond a reasonable doubt. DT's testimony was direct and articulate. The jury could have reasonably believed the extraneous offense evidence beyond a reasonable doubt. *See generally Zarco v. State*, 210 S.W.3d 816, 824–26 (Tex. App.—Houston

[14th Dist.] 2006, no pet.). Accordingly, I agree this court cannot infer that the court's failure to include a beyond-a-reasonable-doubt instruction in the court's punishment charge changed how the jury considered the evidence pertaining to DT.

The testimony regarding child pornography, however, was not admitted during the guilt/innocence phase and the jury, therefore, never received an instruction that it must not consider the extraneous evidence unless it was proven beyond a reasonable doubt. Yet, the charge did instruct the jury that it must not take into consideration, refer to, or allude to Tucker's decision not to testify during the punishment phase. The charge also instructed the jury it was the exclusive judge of the facts proved, of the credibility of the witnesses, and of the weight to be given their testimony, but it was "bound to receive the law from the Court, which is herein given you, and be governed thereby."

Accordingly, I agree with the majority's determination that the admission of the pornography evidence, without an extraneous offense instruction, did not amount to egregious harm.

### (2)     State of the Evidence

Although the testimony was not repeated during the punishment phase, DT's testimony regarding her father's sexual assaults was compelling. She testified to numerous assaults as well as her fear of telling anyone the truth. Sharla's testimony during the punishment phase was not extensive, however, her testimony regarding her discovery of multiple videos of men having sex with children on appellant's laptop computer is not behavior a jury would take lightly.

Even in light of the compelling nature of the testimony, I agree with the majority's determination that the trial court's determination to allow the admission of the evidence did not cause egregious harm.

### (3)    Parties' Arguments at Voir Dire and Closing

During voir dire, the prosecutor told the jury that the burden never shifted to the defendant and the State had to prove its case beyond a reasonable doubt. The defense asked the jury to keep an open mind about the possibility of children lying and the possibility of somebody putting a thought into a child's mind. The record reveals nothing remarkable about the State's brief opening statements. The defense began its opening with three words: "Jealousy, greed, revenge." Counsel said "the seed" was planted when Sharla first did not believe Ka's initial outcry, and the jury would hear evidence about how Sharla used the children as leverage to get money in their pending divorce. Counsel also told the jury Sharla realized Tucker did not have the money; instead, his mother had the money.

### (A)    Closing Argument During the Guilt/Innocence Phase

In the State's closing argument during the guilt/innocence phase, the State explained to the jury why it heard from DT:

> Because where is the jealousy, greed and revenge that you heard about in opening statement? If that is from Sharla then why in the world would that have anything to do with what he did to DT? And that is why she was allowed to come in and tell you. Because it's allowed to rebut his theory. Because it's bull. She isn't even close to [Ka and Ky].

In his closing argument, defense counsel reminded the jury that only Ky and Ka were mentioned in the indictment. Counsel also reminded the jury it was not the defense's burden to show why Ky or Ka would lie, and if they did not believe the girls, then they could not convict simply because they believed DT. Counsel said Sharla "was always about getting money from this family." Counsel said the case against appellant relied entirely on the word of Ky and Ka, and "[Sharla] has a motive to coach." Finally, defense counsel focused a significant portion of closing argument on DT and how the jury should not consider her testimony for the purpose of convicting appellant.

### (B)        First Portion of State's Closing Argument

During its first punishment phase closing argument, the State began by telling the jury what it could consider.

> What's important for you [to] understand in punishment is that now things that you couldn't consider before you absolutely can consider. When you are determining what the appropriate amount of time that Michael Tucker deserves to spend in prison *you can consider what he did to all those girls* sitting over there, [DT], [Ka], [Ky], all three of them. Because you've heard from all three of them about the repeated things that he did over their lifespan.
>
> And you can consider all of that. ***You can consider Sharla's testimony*** to you about the child porn that he had on his computer before [Ky] outcried, all of that. You can talk about it all when you go back to figure out the rightful number of years. And we expect you to do that.

The prosecutor further relayed that Sharla did not want to believe what Tucker was capable of, and stated, "[a]s a mother I find that incredible, but it happened."

Because the prosecution only asked the jury to "consider" the extraneous offense testimony, I agree this argument did not cause Tucker egregious harm. *See McGowan v. State*, 729 S.W.2d 316, 318 (Tex. App.—Dallas 1987, no pet.) (requesting jury consider extraneous offense as a circumstance immediately surrounding the charged offense not error).

### (C)        Defense Closing Argument

Defense counsel appealed to the jury by reminding them of testimony from a jailer about how individuals convicted of aggravated sexual assault of a child and indecency with a child are treated in prison, stating that five years "could be a death sentence in and of itself." Counsel said he was "okay" with the jurors believing the children, but he urged the jurors not to associate Sharla's testimony about the computer with assessing a higher punishment.

(D)    State's Final Closing Argument

After defense counsel closed, the State again argued:

Whenever we get to this stage and whenever we're talking about what to do with someone, you know, we have to start thinking about, okay, well, what did we say he did, what did we convict him of. You all convicted Michael Tucker of having sex with a nine-year-old. That is the most heinous of all the crimes that we prosecute, outside of murder. There is nothing worse than that. There isn't.

And so part of our punishment obviously is to punish. *You know, he has to be punished for what he's done, for the lives that he's ruined, for all of them, for [Ka] and [Ky] and [DT].* Those are things they will never get back. They will never get that back. They will never have that innocence back.

It is a fundamental rule of law that a defendant "should not be assessed punishment for collateral crimes or for being a criminal generally, but is entitled to be punished upon the accusations in the indictment for which he has been found guilty." *Klueppel v. State*, 505 S.W.2d 572, 574 (Tex. Crim. App. 1974); *accord Lomas v. State*, 707 S.W.2d 566, 568 (Tex. Crim. App. 1986) (requiring extraneous offense to be "inexorably connected" before seeking additional punishment); *McGowan*, 729 S.W.2d at 318 ("[A] defendant is entitled to be punished for only those accusations in the indictment for which he has been found guilty, the State is not entitled to ask the jury to assess punishment for collateral crimes that may have been admitted in evidence but were not alleged in the indictment."). Here, the prosecutor asked the jury to do just that.

Tucker was indicted and found guilty for offenses against Ka and Ky. The State instructed the jury to *punish* Tucker for ruining the lives of Ka, Ky, *and DT*. By not only asking the jury to *consider* the extraneous offenses, but instead to affix Tucker's punishment based on the extraneous offenses, the prosecutor exceeded the bounds of proper jury argument. *See* TEX. CODE CRIM. PROC. ANN. art. 37.07 § 3(a); *Klueppel*, 505 S.W.2d at 574. *See also Carrera v. State*, No. 08-05-00264-CR, 2007 WL 766126, at *4 (Tex. App.—El Paso Mar. 15, 2007, no pet.) (not designated for publication) (holding request to consider the extraneous offense proper argument). *But see*

*Sabedra v. State*, No. 05-03-01709-CR, 2005 WL 1155068, at *5–6 (Tex. App.—Dallas May 17, 2005, pet. dism'd) (not designated for publication) (concluding prosecutor exceeded permissible argument when seeking punishment for the abuse he inflicted on all four of the defendant's daughters when only one was alleged in the indictment); *Bennett v. State*, 677 S.W.2d 121, 123–24 (Tex. App.—Houston [14th Dist.] 1984, no pet.) (holding prosecutor exceeded permissible argument by requesting punishment for the four children contained in the indictment and a fifth child for which defendant was not convicted).

In light of the State's argument, and the lack of a limiting instruction within the charge, I would hold that Tucker suffered egregious harm and remand this matter for a new hearing on punishment. *Almanza*, 686 S.W.2d at 171. Accordingly, I respectfully dissent from the majority's determination that Tucker did not suffer egregious harm.

Patricia O. Alvarez, Justice

PUBLISH